UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
FCS ADVISORS, LLC DBA BREVET CAPITAL ADVISORS,

                    Plaintiff,

   - v. -

PRECISION DEVICES, LLC and DAN BRUNSTETTER,

                    Defendants.
-----------------------------------------------------------------------x

Case No.:

**COMPLAINT**

Plaintiff FCS Advisors, LLC dba Brevet Capital Advisors ("Brevet" or "Purchaser"), by and through its attorneys, Parker Pohl LLP, as and for its Complaint against Defendants Precision Devices LLC ("Precision Devices") and Dan Brunstetter ("Brunstetter" or "Guarantor", together with Precision Devices, "Defendants"), alleges as follows:

## NATURE OF THE CASE

1. This action arises from Precision Devices' default on its contractual promise to pay Brevet $480,980.48, plus fees and costs, pursuant to a Brevet Capital Advisors Receivables Purchase Agreement ("Agreement").

2. Precision Devices possessed "Employee Retention Credit Accounts" which entitled it to receive refunds from the IRS for previously paid taxes. Brevet purchased those accounts from Precision Devices and thus obtained the right to receive those refunds from the IRS instead of Precision Devices.

3. To purchase the accounts, Brevet paid Precision Devices $480,980.48, less a finance fee. Precision Devices – under the stewardship of Defendant Dan Brunstetter, the CEO of Precision Devices – then decided not only to reap the benefit of Brevet's payment, but also to keep the payments it received from the IRS and that it is obligated to pay over to Brevet.

4. Those payments (plus other amounts as detailed below) are currently due and owing to Brevet pursuant to the clear, unconditional terms of the parties' Agreement.

5. Moreover, Defendant Brunstetter is the personal guarantor of the company's contractual obligations to Brevet pursuant to a written guaranty (the "Guaranty").

6. Precision Devices – as the primary obligor – has largely ignored its contractual payment obligations despite due demand.

7. Brunstetter – as Guarantor – has similarly refused to comply with his contractual obligations despite due demand.

8. Put simply, Defendants stole Brevet's money.

9. Despite repeated demands, Defendants have offered no legitimate explanation for their failure to remit the IRS refunds to Brevet, nor is there one, and have made a calculated, bad faith decision to wrongfully retain funds that belong to Plaintiff.

10. Brevet brings this action to recover all amounts due and owing, and to hold Defendants accountable for their brazen theft of Brevet's money.

**PARTIES**

11. Plaintiff is a limited liability company organized under the laws of Delaware, with its principal place of business at 441 Ninth Avenue, 20th Floor, New York, NY 10001.

12. Defendant Precision Devices is a limited liability company with its principal place of business at 55 North Plains Industrial Road, Wallingford, Connecticut 06492.

13. Defendant Brunstetter is an individual residing in Charleston, South Carolina, upon information and belief.

**JURISDICTION AND VENUE**

14. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity and the amount in controversy exceeds $75,000.

15. Plaintiff FCS Advisors, LLC d/b/a Brevet Capital Advisors is a citizen of New York and has one member, which is a Delaware limited liability company ("DE1"). DE1, in turn, has two individual members, both of whom are citizens of New York, and one entity member, which is a Delaware limited liability company ("DE2"). DE2 has three members: two individuals both of whom are citizens of New York, and one entity member, which is a Delaware limited liability company ("DE3"). DE3 has two members, both of whom are citizens of New York.

16. Defendant Precision Devices is a citizen of Connecticut and Defendant Brunstetter is citizen of South Carolina. Upon information and belief, no other member of Precision Devices is a citizen of New York or Delaware.

17. This Court has personal jurisdiction, and venue is proper, pursuant to Paragraph 25 of the Agreement and Paragraph 10 of the Guaranty. Paragraph 25 of the Agreement states, *inter alia*, that any suit arising out of a breach of the Agreement "shall, if Purchaser so elects, be instituted in the state and federal courts located in the State of New York" and each party "irrevocably and unconditionally" submits to such jurisdiction and "waives any and all objections to jurisdiction or venue" in such jurisdiction. Likewise, pursuant to Paragraph 10 of the Guaranty, the Guarantor "consents to the exclusive jurisdiction of the local, state or federal court located with[in] the State of New York."

18. Venue is also proper under 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events or omissions giving rise to this action occurred in this district.

## FACTS

**Employee Retention Credits**

19. To provide tax relief to businesses impacted by the Coronavirus pandemic in 2020 and 2021, Congress passed legislation providing eligible employers with certain tax credits called Employee Retention Credits ("ERC"). (Such legislation included the Coronavirus Aid, Relief, and

3

Economic Security Act; the Taxpayer Certainty and Disaster Tax Relief Act of 2020; and the American Rescue Plan Act of 2021).

20. To obtain the credit, eligible employers may seek an IRS refund of previously paid taxes by filing amended tax returns.

21. Many businesses seeking ERC refunds face lengthy wait times. To enable those businesses to receive funds sooner, Brevet purchases the businesses' "Employee Retention Credit Accounts" ("<u>ERC Accounts</u>"), thereby providing the businesses immediate cash in exchange for a finance fee and absolute ownership of the ERC refunds the IRS eventually pays the business, all pursuant to written contracts.

**<u>Brevet's Contract with Precision Devices</u>**

22. On June 17, 2022, Brevet and Precision Devices entered into a Brevet Capital Advisors Receivables Purchase Agreement ("<u>Agreement</u>"), and Brevet and Brunstetter entered into a Brevet Capital Advisors Validity Agreement ("<u>Guaranty</u>" and, together with the Agreement, the "<u>Precision Devices Contracts</u>"). The Precision Devices Contracts are attached hereto as <u>Exhibit A</u>.

23. Precision Devices is the "<u>Seller</u>" in the Agreement. (Agreement, Cover Page & ¶ 2.1)

24. The Agreement defines ERC Accounts as:

> <u>all currently existing and hereafter arising amounts owing or to become due to the Seller constituting Employee Retention Tax Credit refunds</u> (as set out in the Coronavirus Aid, Relief, and Economic Security Act, the Taxpayer Certainty and Disaster Tax Relief Act of 2020, and the American Rescue Plan Act of 2021, and any related legislation enacted in the future), <u>together with all amounts, fees, charges, interest and other amounts relating to, arising under or in connection with such accounts</u>.

(*Id.*, ¶ 1 (Definitions) (emphasis added))

25. All such amounts owing, or to become due, on any ERC Account are referred to as the "ERC Claim Amount." (*Id.*)

4

26. The Agreement's Schedule of Accounts specifies the ERC Accounts Brevet purchased pursuant to the Agreement and their dollar values. (*Id.*, Schedule of Accounts)

27. The Schedule of Accounts also shows the "ERC Claim Total," which is the aggregate value of the ERC Claim Amounts, i.e., <u>the total value of the credit/refund an eligible employer was entitled to receive from the IRS and which Brevet became entitled to receive as the Purchaser</u>. (*Id.*)

28. The "Purchase Price" that Brevet agrees to pay the Seller (in exchange for the right to collect the ERC Claim Total) is the amount equal to the ERC Claim Total minus a "buffer," which is intended to cover certain fees or other potential offsets against or reductions of the ERC Claim Amount, <u>if any</u>. (*See id.*, ¶1, ¶ 2.4)

29. Brevet then subtracts a 10% "Finance Fee" from the ERC Claim Total (a nominal return to Brevet) yielding a "Cash Payment to Seller." (*Id.*, Schedule of Accounts)

**Brevet Purchases the ERC Accounts from Precision Devices**

30. On June 17, 2022, Brevet purchased three ERC Accounts from Precision Devices with an ERC Claim Total of $534,422.76 ("<u>Precision Devices Purchased Accounts</u>"), for the total Purchase Price of $480,980.48. The Schedule of Accounts shows the following calculation of the Purchase Price and Net Proceeds to Seller:

| | | |
|---|---|---|
| **ERC Claim Total** | $ | 534,422.76 |
| (-) Buffer | $ | 53,442.28 |
| **Purchase Price** | $ | 480,980.48 |
| (-) Finance Fee | $ | 53,442.28 |
| **Cash Payment to Seller** | $ | 427,538.21 |
| (-) Synergi Partners Invoice | $ | 21,721.38 |
| Net Proceeds | $ | 405,816.83 |

(*See* <u>Exhibit A</u>, Schedule of Accounts)

31. Brevet effected the purchase of the Precision Devices Purchased Accounts on June 17, 2022 ("<u>Purchase Date</u>"), by (1) paying a Synergi Partners Invoice on Precision Devices' behalf and

5

at Precision Devices' direction and (2) wiring the remaining Net Proceeds of $405,816.83 to Precision Devices. (*See* Wire Confirmation – <u>Exhibit B</u>)

33. 32. Upon payment of the Purchase Price, Brevet became the "absolute owner" of the ERC Accounts. (Agreement, ¶ 2.1.2)

33. As the "absolute owner," Brevet has the absolute right to payment of any and all refunds the IRS sends to the Seller related to the ERC Accounts: "[T]he Purchased Accounts are and will remain *unconditionally owed and will be paid to Purchaser and are not subject to any disputes, offsets, set-offs, counterclaims, or cancellation.*" (*Id*., ¶ 9.6 (emphasis added); *see also* Schedule of Accounts, Seller's Representations and Warranties (reiterating that "the Accepted Accounts are and shall remain unconditionally owed and will be paid to Purchaser without defenses, disputes, offsets, or counterclaims"))

**Defendants' Obligations Under the Agreement and the Guaranty**

34. Precision Devices' obligations to ensure payment to Brevet (either directly from the IRS or from Precision Devices, if it receives the refunds from the IRS), include:

- Taking "all actions necessary to direct any and all payments from the IRS Account Debtor to Purchaser, including, at the request of Purchaser, communicating with the IRS Account Debtor and/or as referenced in <u>Section 6.3</u> hereof, as instructed by Purchaser" (*Id.,* ¶ 2.2);

- Instructing "the IRS Account Debtor, whether through a payroll provider or otherwise, to pay such ERC Claim to the <u>Purchase Depository</u>, as detailed in Schedule A herein" (*Id.*, ¶ 6.3);

- Paying "the amount of any payment on account of a Purchased Account received by Seller to Purchaser within 3 business days following date of the receipt thereof by Seller" (*Id.,* ¶ 6.7); and

- Directing the IRS "to send all payments relating to the Purchased Accounts to [Brevet's] lockbox address specified in Schedule A (by any means necessary . . . ) until [Brevet] has received funds in an amount equal to the total Purchase Price of all Purchased Accounts as well as all fees and expenses due and payable to Purchaser" (*Id.,* ¶ 6.11).

6

35. The Agreement also requires Precision Devices to provide access to "all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Seller's books and records . . . ." (*Id*. ¶ 6.2)

36. Moreover, Precision Devices "irrevocably authorizes all accountants and third parties to disclose and deliver to [Brevet] at Seller's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Seller." (*Id.*)

37. The Agreement identifies multiple Events of Default, including if:

- "Seller defaults in the payment of any Obligations or in the performance of any provision hereof . . ." (Agreement, ¶ 10.1(a));

- "Seller is in breach of any covenants listed in Section 6 herein" (which includes the obligation to pay any amounts of the Purchased Accounts received by Precision Devices within 3 days of receipt) (*Id*., ¶ 10.1(g)); and

- Seller fails "to remit any amounts paid to Seller by the IRS Account Debtor with respect to a Purchased Account to Purchaser within 3 business days." (*Id.,* ¶ 10.1(h)).

38. An Event of Default, among other rights, gives Brevet the right to terminate the Agreement, at which time all Obligations become immediately due and owing. (*Id.,* ¶ 10.2)

39. Any Purchased Account that remains unpaid beyond 300 days from the Purchase Date begins to accrue a 1.0% Late Payment Fee accruing every 30 days thereafter (*see id.,* ¶ 1 (Late Payment Date definition); ¶ 3.2 (late payment fee provision)), and an Event of Default causes the immediate accrual of a 3.0% default fee (*id.,* ¶ 10.2).

40. Brevet also has the right to require Seller to repurchase, "by payment of the unpaid Purchase Price . . . Any Purchased Account that remains unpaid fifteen (15) months after the Purchase Date of such ERC Account." (*Id.,* ¶ 4.1.5)

7

41. Finally, the Agreement contains a broad General Release in favor of Brevet, releasing Brevet from any and all claims "to the extent that they arise out of or are in [any] way connected to or are related to Seller' [sic] relationship with Purchaser." (*Id.*, ¶ 27)

42. The Guaranty provides, as relevant, that the Guarantor "unconditionally guaranties, warrants and covenants that . . . the amount of each Purchased Account is due and owing to Company and represents an accurate statement of a bona fide IRS tax refund." (Guaranty, ¶ 1) The Guaranty also provides that if the Seller or Guarantor receives any payment on the accounts purchased by Brevet:

> whether payment is by an instrument made payable to Brevet Capital Advisors, Company or otherwise, neither Company *nor such Validity Guarantor will deposit or seek to negotiate the payment and will insure that such payment is* delivered only to Brevet Capital Advisors, and Company or such Validity Guarantor will turn over any such payment to Brevet Capital Advisors within 3 days of receipt in the original form payment was received. *Until delivery to Brevet Capital Advisors, such payment shall be held in trust for the sole and exclusive benefit of Brevet Capital Advisors.*

(*Id.*, ¶ 2 (emphasis added))

43. Guarantor further agrees to indemnify and hold Brevet harmless (1) from any damage, loss, claim or liability Brevet "may sustain or incur as a result of any breach of the warranties or covenants set forth" in the Guaranty, and (2) for Precision Devices "failing or refusing … to comply with the provisions of the Purchase Documents," and "to be liable for claims arising out of any such Breach." (*Id.*)

44. Guarantor waives "any and all defenses available to a surety, guarantor or accommodation co-obligor until the Obligations are indefeasibly paid in full in cash." (*id.,* ¶ 4), and the Guarantor's obligations are joint and several (*id.*, ¶ 12).

45. Finally, Brevet is entitled to all costs and expenses, including attorneys' fees, incurred in enforcing the Agreement or the Guaranty. (Agreement, ¶ 14.2, Guaranty, ¶ 7)

**Precision Devices Is In Default Under the Agreement and Brunstetter Is In Breach of the Guaranty**

46. In or around May 2022, Precision Devices instructed the IRS, via Paychex, to direct IRS refunds to a Precision Devices bank account rather than to the bank account listed in Schedule A of the Agreement.

47. Instructing the IRS Account Debtor, whether through a payroll provider or otherwise, is in and of itself a breach of the Agreement. (*See* Agreement, ¶ 6.3)

48. Furthermore, in or around late 2024, Precision Devices stopped responding to Brevet's requests for information regarding the additional ERC refunds due from the IRS.

49. Moreover, Precision Devices' refusal to respond to Brevet's requests for information suggests that it is hiding its receipt of the additional IRS refunds. (*See* Agreement, ¶ 6.2)

50. Upon information and belief, Precision Devices received payment from the IRS totaling at least $533.792.76 on the ERC Accounts identified in the Agreement.

51. In November 2022, after receiving its first refund, Precision Devices complied with its payment obligations under the Agreement and paid Brevet $260,571.49.

52. However, Precision Devices has failed and refused to remit the remaining IRS payments to Plaintiff, as required under the Agreement.

53. Alternatively, upon information and belief, Precision Devices intends, once it does receive the additional IRS refunds, to retain those refunds for itself and not turn them over to Brevet.

54. In breach of the Agreement, Precision Devices has engaged in several wrongful acts, each of which constitutes an Event of Default under Paragraphs 10.1(a), (g), and (h) of the Agreement. Those acts include, without limitation:

    a. failing to direct the IRS to send all payments relating to the Purchased Accounts to Brevet, in breach of Paragraphs 6.3 and 6.7; and

    b.  receiving payments on the Purchased Accounts directly from the IRS but failing to make payment to Brevet within 3 business days of receipt, in breach of Paragraph 6.7 of the Agreement.

  55.  Despite his express obligations under the Guaranty to hold any such payments in trust for Brevet's sole benefit, upon information and belief, Brunstetter deposited and/or negotiated payments from the IRS and has refused to turn them over to Brevet (within 3 days of receipt or otherwise). Brunstetter has also failed to indemnify Brevet for Precision Devices' breaches of the Agreement. The foregoing is in breach of Paragraph 2 of the Guaranty.

**<u>Brevet Notifies Defendants of Default and Demands Payment Numerous Times</u>**

  56.  By email dated June 18, 2025, William Leombruno of Boston Portfolio Advisors, writing on behalf of Brevet, sent Precision Devices a letter providing notice that various breaches or potential breaches of Precision Devices' representations, warranties or covenants had occurred and were continuing to occur under the Agreement. (A true and correct copy of the June 18, 2025 letter is attached hereto as <u>Exhibit C</u>.)

  57.  In the June 18, 2025, letter, Brevet warned that if Precision Devices failed to remit payment in full by June 30, 2025, it would be in default under the Agreement and Brevet would be entitled to a Default Fee and other costs and expenses incurred in enforcing the Agreement. (*See* <u>Exhibit C</u>)

  58.  Precision Devices did not make payment in response to the June 18, 2025 email or letter.

  59.  On July 10, 2025, due to Precision Devices' failure to remit payment by the June 30, 2025 deadline, Brevet sent Precision Devices another email, informing it of its default for failure to pay all amounts due and owing under the Agreement. (A true and correct copy of the July 10, 2025 email from Brevet to Precision Devices is attached hereto as <u>Exhibit D</u>.)

60. Precision Devices did not make payment in response to the July 10, 2025 email.

61. By letter dated August 5, 2025, Brevet, through counsel, again notified Precision Devices that it was in default under the Agreement and demanded payment of the Purchase Price owed thereunder. As of the date of this filing, Precision Devices has failed and refused to make such payment. (A true and correct copy of the August 5, 2025 letter from Parker Pohl LLP to Precision Devices is attached hereto as Exhibit E.)

62. The August 5, 2025 letter also notified Brunstetter (as Guarantor of Precision Devices' obligations under the Agreement) that he was in breach of the Guaranty and demanded payment from him. (*See* Exhibit E) As of the date of this filing, Brunstetter has failed and refused to make payment to or otherwise indemnify Brevet.

63. As of the date of this filing, Precision Devices owes Brevet not less than $294,995.40 under the Agreement – comprised of the outstanding Purchase Price of $220,408.99, Late Payment Fees in the amount of $66,122.71 (which are continuing to accrue), and a 3% Default Fee of $8,463.71 – plus attorneys' fees and costs and interest in amounts to be determined.

**FIRST CAUSE OF ACTION**
**(Breach of Agreement – Against Defendant Precision Devices)**

64. Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

65. The Agreement is a valid and existing contract between Plaintiff, on the one hand, and Defendant Precision Devices on the other.

66. Plaintiff performed all of its obligations under the Agreement.

67. Precision Devices has breached its obligations under the Agreement by, inter alia, failing to repurchase the Purchased Accounts upon due demand after those accounts remained unpaid for more than fifteen months.

11

68. Precision Devices has breached its obligations under the Agreement by receiving funds from the IRS that the Agreement requires it to pay over to Brevet with 3 days of receipt and failing to pay those funds over to Brevet.

69. As a result of the foregoing, Plaintiff has been damaged in an amount to be determined at trial but believed to be not less than USD $294,995.40 (*see above*, ¶ 63), plus attorneys' fees and costs and interest in amounts to be determined.

## SECOND CAUSE OF ACTION
### (Breach of Guaranty – Against Defendant Brunstetter)

70. Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

71. The Guaranty is a valid and existing contract between Brevet, on the one hand, and Defendant Brunstetter as Guarantor on the other.

72. Plaintiff performed all of its obligations under the Guaranty.

73. Pursuant to the Guaranty, Brunstetter as Guarantor is liable for all amounts that Precision Devices has failed to pay under the Agreement.

74. Brunstetter has breached his obligations as Guarantor under the Guaranty by failing to pay to Brevet amounts due under the Agreement.

75. As a result of the foregoing, Plaintiff has been damaged in an amount to be determined at trial but believed to be not less than USD $294,995.40 (*see above*, ¶ 63), plus attorneys' fees and costs and interest in amounts to be determined.

## THIRD CAUSE OF ACTION
### (Conversion – Against Both Defendants)
### (In the Alternative to Plaintiff's First and Second Claims)

76. Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

77. Plaintiff owns, possesses, and controls the right to receive payments from the IRS on account of the accounts it purchases from Precision Devices.

12

78. Upon information and belief, Defendants have received payments of specific funds in an amount believed to be not less than $220,408.99 from the IRS on account of the Precision Devices Purchased Accounts – payments that rightfully belong to Plaintiff.

79. Said funds are identifiably Plaintiff's property based on the terms of the Agreement and the payments made by the IRS, and Precision Devices and Brunstetter were obligated to segregate them for Plaintiff's benefit.

80. Defendants knew the funds belonged to Plaintiff when they received them and they have wrongfully misappropriated those funds for their own purposes and own benefit.

81. Defendants thus wrongfully engaged in the assumption and exercise of the right of ownership over funds that rightfully belong to Plaintiff.

82. Defendants are engaged in unauthorized dominion over Plaintiff's funds, to the exclusion of Plaintiff's rights.

83. Defendants Precision Devices and Brunstetter, together or individually, currently possess the funds that rightfully belong to Plaintiff.

84. Defendants intend to permanently deprive Plaintiff of the funds.

85. As a result of Defendants' wrongful conduct, Plaintiff has been damaged in an amount to be determined at trial but believed to be not less than $294,995.40 (*see above*, ¶ 63). In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

### FOURTH CAUSE OF ACTION
**(Unjust Enrichment Against All Defendants)**
**(In the Alternative to Plaintiff's Breach of Contract and Guaranty Claims)**

86. Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

87. Plaintiff conferred benefits upon Defendant Precision Devices in the form of payment of the agreed-upon Purchase Price, directly to Defendant Precision Devices or to third parties on its behalf and at its direction.

88. By payment of the Purchase Price, Brevet obtained certain rights, namely the right to receive any IRS refund issued on the ERC Accounts and/or to have Defendant Precision Devices and Brunstetter pay over any IRS refunds to Brevet received by Precision Devices.

89. Upon information and belief, Precision Devices and/or Brunstetter have received the IRS refunds but have refused to turn them over to Brevet, despite due demand.

90. Defendants have unlawfully enriched themselves at Brevet's expense by unlawfully retaining (or retaining the benefit of) both the Purchase Price paid by Brevet and the IRS refunds issued to Precision Devices to which Brevet it rightfully entitled.

91. It would be against equity and good conscience to permit Defendants to retain a double payment, namely the Purchase Price paid for the ERC Accounts by Brevet and the IRS refunds they received for those same ERC Accounts.

92. As a result, Brevet is entitled to all available damages and relief.

**WHEREFORE,** Plaintiff demands judgment against Defendants, jointly and severally, as follows:

A. Monetary damages against Defendants in an amount to be determined at trial which, as of the date of this filing, amounts to not less than USD $294,995.40, plus attorneys' fees, costs, and interest;

B. Attorney's fees and costs pursuant to the contractual fee-shifting provisions in the relevant agreements;

C.     Punitive damages for Defendants' gross, wanton, willful and/or morally culpable conduct;

D.     Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

E.     Such other and further relief that this Court may deem just and proper.

Dated: New York, New York
      October 8, 2025

**PARKER POHL LLP**

By: /s/ *M. Todd Parker*
      M. Todd Parker
      Wendy W. Tannenbaum
99 Park Avenue, Suite 1510
New York, New York 10016
(212) 203-8915
todd.parker@parkerpohl.com
wendy.tannenbaum@parkerpohl.com

*Attorneys for Plaintiff*